FILED
2020 Dec-18  PM 01:10
U.S. DISTRICT COURT
N.D. OF ALABAMA



**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| | } | |
| **v.** | } | |
| | } | **Case   No.:   2:07-cr-394-MHH-** |
| | } | **JHE-1** |
| **LARRY CHARLES WELCH,** | } | |
| | } | |
| | } | |

## <u>MEMORANDUM OPINION AND ORDER ON MOTION FOR</u>
## <u>COMPASSIONATE RELEASE</u>

Defendant Larry Charles Welch has filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act of 2018. (Doc. 83).  Mr. Welch asks the Court to reduce his sentence "to a sentence of time served . . . under extraordinary and compelling circumstances." (Doc. 83, p. 1).

### I.     Background

In 2007, when Mr. Welch was 51, a jury found him guilty of possession with intent to distribute 50 grams or more of a mixture and substance of cocaine base and an amount of marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and (b)(1)(D) (Count 1); carrying a firearm during and in relation to

1

a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count 2); and being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count 3).  (Docs. 30-32).

Mr. Welch faced an enhanced sentence because, prior to sentencing, the United States filed an Information under 21 U.S.C. § 851 for a prior conviction of possession of a controlled substance, and Mr. Welch's criminal history made him a career offender.  In 2008, the Court sentenced Mr. Welch to 420 months of imprisonment and 120 months of supervised release.  (Doc. 39, pp. 2-3). Earlier this year, the Court amended Mr. Welch's sentence to 240 months of imprisonment and 96 months of supervised release.  (Doc. 91).[1]

Mr. Welch now is a 64-year-old prisoner at FCI Talladega.  (Doc. 83, p. 1).  He has been incarcerated for his conduct in this case for 164 months.  His projected release date is in May 2024.  He submitted a request for compassionate release to the warden at Talladega; the warden denied the request.  (Docs. 83-1; 83-2).  Mr. Welch then filed a motion for compassionate release in this case. (Doc. 83).  He argues that "[h]is age and chronic medical conditions place him at greater risk of severe COVID-19 illness and death should he contract the

―――――――――――――――

[1] The Honorable James H. Hancock initially sentenced Mr. Welch.  (Doc. 39).  Because Mr. Welch was sentenced on Count 1 before August 3, 2010, on an offense covered by the Fair Sentencing Act and because none of the exceptions to a sentence modification applied, the undersigned resentenced Mr. Welch in October 2020.  (Docs. 90, 91).

virus." (Doc. 83, p. 1). Medical records indicate that Mr. Welch is a BOP chronic care prisoner who is being treated for hypertension, type 2 diabetes, and hepatitis C. (Docs. 83-4, 83-5). According to today's data from the Bureau of Prisons, Talladega FCI has 22 inmates and 26 staff members with confirmed cases of COVID-19. So far, 158 inmates and 9 staff members at the facility have recovered from COVID-19, and one inmate has died. COVID-19 CORONAVIRUS, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Dec. 16, 2020).[2]

## II.    Analysis

Generally, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). "The authority of the district court to modify an imprisonment sentence is narrowly limited by statute." *United States v. Philips*, 597 F.3d 1190, 1194-95 (11th Cir. 2010). Under § 3582(c)(1)(A)(i), a district court may modify a sentence for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i).

A defendant may file a motion for compassionate release under § 3582(c)(1)(A)(i) with the sentencing court after he exhausts his administrative remedies. 18 U.S.C. § 3582(c)(1)(A). A defendant may exhaust his administrative remedies by appealing the BOP's failure to bring a motion for

--------

[2] A few days ago, 36 Talladega prisoners were sick with COVID-19.

modification of sentence or by filing a request for relief to which the warden of his facility does not respond within 30 days.  When a defendant fulfills the exhaustion condition, a district court may reduce the defendant's sentence if the defendant demonstrates that extraordinary and compelling circumstances support a reduction, and a sentence modification is consistent with relevant policy statements from the Sentencing Commission and the sentencing factors at 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A)(i).

Mr. Welch submitted a request for compassionate release to the warden at FCI Talladega on June 30, 2020.  (Doc. 83-1).  The warden denied Mr. Welch's request on July 18, 2020.  (Doc. 83-2).  Because Mr. Welch has satisfied the exhaustion requirement; therefore, the Court may reach the merits of his request for a sentence modification.

Congress has not identified specific situations that rise to the level of "extraordinary and compelling" circumstances warranting a sentence modification, but the United States Sentencing Commission, in a policy statement, has indicated that compelling reasons for sentence reduction may include:

(A) Medical condition of the Defendant -

(i)      …

(ii)     The defendant is—

(I)     Suffering from a serious physical or medical condition,

(II)    Suffering from a serious functional or cognitive impairment, or

(III)   Experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

. . .

(D) Other Reasons — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n. 1.

Mr. Welch's case is this:  he is four months shy of his sixty-fifth birthday, and he has served 13 years and eight months of his sentence.  (Doc. 37, p. 2; Doc. 83-4, p. 1).[3]  Mr. Welch's medical records establish that he is obese; he is six feet tall, and he weighed 238 pounds in May 2020.  (Doc. 37, p. 19; Doc. 83-5, pp. 14, 33).  He has hypertension, type 2 diabetes, hepatitis C, sciatica,

_____

[3] As of 2020, Mr. Welch has earned just over 700 days of good conduct time, and he has 348 days of prior jail credit.  (Doc. 90-1, p. 2).

osteoarthritis, glaucoma, periodontal problems, disorder of the prostate, and edema, among other issues. (Doc. 83-5, pp. 5-6, 22, 40-42, 54). He is restricted from lifting more than 15 pounds and cannot stand for prolonged periods of time; he uses a back brace. (Doc. 83-5, pp. 32, 35, 52). Years ago, he had surgery to repair a punctured lung, and he has latent TB that has been treated. (Doc. 37, p. 19; Doc. 83-5, pp. 25, 34, 54). BOP designated Mr. Welch as a chronic care prisoner in February 2010 and has maintained that designation for him since then. (Doc. 83-4, p. 1).

Given his age and his numerous chronic health conditions, Mr. Welch is vulnerable to severe outcomes if he should contract COVID-19. COVID-19 is "a novel severe acute respiratory illness" for which "there is no known cure" and "no effective treatment . . ." *South Bay United Pentecostal Church v. Newsom*, 10 S. Ct. 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief). COVID-19 is widespread in the United States and is highly contagious. Individuals with compromised immune systems and certain medical conditions are more susceptible to severe symptoms and more likely to die from the disease. PEOPLE WHO ARE AT HIGHER RISK FOR SEVERE ILLNESS, CORONAVIRUS DISEASE 2019 (COVID-19), CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-

risk.html?CDC_AA_refVal=https% 3A% 2F% 2Fwww.cdc.gov% 2Fcoronavirus% 2F2019-ncov% 2Fspecific-groups% 2Fhigh-risk-complications.html (last updated November 30, 2020).  The pandemic is now nearly one year old, and it "remains extraordinarily serious and deadly." *Roman Catholic Diocese of Brooklyn v. Cuomo*, --- S.Ct. ---, 2020 WL 6948354, at *8 (Nov. 25, 2020) (Kavanaugh, J., concurring).  The United States has recorded more than 16.5 million COVID-19 cases and more than 302,990 deaths since January 21, 2020.  UNITED STATES COVID-19 CASES AND DEATHS BY STATE, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Dec. 16, 2020).

Over the past several weeks, as temperatures have fallen and people have spent more time indoors, COVID infections have increased at significant rates. The United States is averaging more than 2,000 deaths per day every day of December, a weekly average of 182,663 new cases per day, and 101,276 hospitalizations (a record number).  Noah Higgins-Dunn, *Covid is Killing More than 2,000 People a Day in the U.S. as Infections and Hospitalizations Hit Records*, CNBC, Dec. 5, 2020, https://www.cnbc.com/2020/12/05/covid-is-killing-more-than-2000-people-a-day-in-the-us-as-infections-surge.html.  Dr. Robert Redfield, Director of the CDC, recently said that "the next three months are 'going to be the most difficult time in the public health history of this

7

nation'" and that the United States death toll could reach 450,000 by February 2021.  Antonia Noori Farzan et al, *Coronavirus Live Updates: U.S. Reports More Than 200,000 New Cases and 100,000 Hospitalizations for First Time*, WASHINGTON                                                                                          POST, https://www.washingtonpost.com/nation/2020/12/03/coronavirus-covid-live-updates-us/ (last visited Dec. 3, 2020).

In Alabama, where Mr. Welch is imprisoned, there are more than 297,000 confirmed COVID-19 cases and more than 4,000 deaths. ALABAMA, CORONAVIRUS RESOURCE CENTER, JOHNS HOPKINS UNIVERSITY OF MEDICINE, https://coronavirus.jhu.edu/region/us/alabama (last visited Dec. 15, 2020).  In the past week, the state has seen some of its highest daily case totals to date, with 22, 596 new cases and 219 deaths.  Alabama's positive test rate continues to rank among the highest in the nation, ranging from 31 to almost 33 percent. *Alabama Saw 22k COVID-19 Cases, 219 Deaths, Record Hospitalizations Last Week*, WSFA12 NEWS, https://www.wsfa.com/2020/12/07/alabama-saw-k-covid-cases-deaths-record-hospitalizations-last-week/ (December 7, 220, 12:01 PM CST).  FCI Talladega is no exception to this upward trend in new cases.  Inmate infections almost doubled during the week of December 7, 2020, rising from 19 cases to 36.  COVID-19 CORONAVIRUS, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Dec. 11, 2020).  While fewer

than 50 prisoners at FCI Talladega currently have COVID-19, "a single prisoner infection ultimately threaten[s] the entire institutional community."   Lee Kovarsky, *Pandemics, Risks, and Remedies*, 106 VA. L. REV. ONLINE 71 (2020). This is especially true when prisons do not test asymptomatic prisoners.[4] "Because people may be infected but asymptomatic, they may unwittingly infect others." *South Bay United Pentecostal Church*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).

As the United States Court of Appeals for the Eleventh Circuit explained, "[i]t would be a colossal understatement to say that the COVID-19 pandemic has had far-reaching effects." *Swain v. Junior*, 961 F.3d 1276, 1280 (11th Cir. 2020).   The Court of Appeals recognized that COVID-19 "poses particularly acute challenges for the administration of the country's jails and prisons. Because incarcerated inmates are necessarily confined in close quarters, a contagious virus represents a grave health risk to them—and graver still to those who have underlying conditions that render them medically vulnerable." *Swain*, 961 F.3d at 1280.   Professor Kovarsky powerfully summed up the prison

---

[4] *See* Linda So & Grant Smith, *In Four U.S. State Prisons, Nearly 3,300 Inmates Test Positive for Coronavirus -- 96% Without Symptoms*, REUTERS (Apr. 25, 2020, https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in/in-four-u-s-state-prisons-nearly-3300-inmates-test-positive-for-coronavirus-96-without-symptoms-idUSKCN2270RX); Dawson White, *Prisons Slammed with Coronavirus Cases – And Many Inmates Don't Have Symptoms*, MIAMI HERALD (Apr. 28, 2020, https://www.miamiherald.com/news/coronavirus/article242338956.html).

COVID-19 situation: "prisons present systemic risks because the health infrastructure is deplorable, social distancing is impossible, and the prisoner community has heightened medical vulnerabilities. Those facilities [are] pandemic tinderboxes, and COVID [is] more than enough to kindle the blaze." Kovarsky, *Pandemics, Risks, and Remedies*, 106 VA. L. REV. ONLINE 71, 97 (2020).[5]

As noted, Mr. Welch is a prisoner with heightened medical vulnerabilities. At six feet tall and 238 pounds, he has a body mass index (BMI) of 32.3. (Doc. 83, p. 6). The CDC reports that a BMI of 18.5 to less than 25 is within normal range, a BMI of 25.0 to less than 30 is within the overweight range, and a BMI of 30.0 or higher falls within the obese range. DEFINING ADULT OVERWEIGHT AND OBESITY, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/obesity/adult/defining.html#:~:text=If%20your%20BMI%20is%2018.5,falls%20within%20the%20obese%20range (last visited December 11, 220). The CDC lists obesity as an underlying medical condition that puts patients "at higher risk for severe COVID-19 associated illness." Hilda

---

[5] *See also* Sharon Dolovich, *Mass Incarceration, Meet COVID-19*, 11/16/2020 U. CHI. L. REV. ONLINE 4 (2020) ("From the earliest days of the pandemic, it was clear that the novel coronavirus posed an outsized danger to the more than two million people locked inside America's prisons and jails. . . . By summer, infection rates in state and federal prisons dwarfed national rates by a ratio of 5.5 to 1, and, accounting for age, people in prison were dying at three times the rate of society as a whole.").

Razzaghi et al., *Estimated County-Level Prevalence of Selected Underlying Medical Conditions Associated with Increased Risk for Severe COVID-19 Illness – United States, 2018*, CENTERS FOR DISEASE CONTROL AND PREVENTION, July 24, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6929a1.htm?s_cid=mm6929a 1_w (listing obesity as risk factor for severe COVID-19 outcome).  Researchers have confirmed that "[a] growing body of evidence indicates that obesity is strongly and independently associated with adverse outcomes of COVID-19, including death."   Sam M. Lockhart & Stephen O'Rahilly, *When Two Pandemics Meet: Why is Obesity Associated with Increased COVID-19 Mortality?*, MED (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7323660/pdf/main.pdf; *see also* Sara Y. Tartof, et al., *Obesity and Mortality Among Patients Diagnosed with COVID-19: Results From an Integrated Health Care Organization*, ANNALS OF INTERNAL MEDICINE (2020), https://www.acpjournals.org/doi/pdf/10.7326/M20-3742 (concluding that "[o]besity plays a profound role in risk for death from COVID-19, particularly in . . . younger populations" and identifying severe obesity as "a target for early intervention.").

District courts in this circuit have concluded that obesity is a comorbidity justifying compassionate release because of the heightened risk that COVID-19 poses to obese prisoners. *See, e.g.*, *United States v. Asher*, 467 F. Supp. 3d 1285, 1291 (N.D. Ga. 2020) (granting compassionate release because defendant was at "higher risk for getting and becoming seriously ill and dying from COVID-19 because of his medical conditions" including obesity); *United States v. Howard*, --- F. Supp. 3d ---, 2020 WL 5644880, at *3 (M.D. Ala. Sept. 22, 2020) (granting compassionate release because obesity and other comorbidities "present[] 'extraordinary and compelling' reasons for release" particularly because "these chronic conditions substantially diminish his ability 'to provide self-care within the environment of a correctional facility . . .'").

In addition to obesity, Mr. Welch has hypertension, more commonly known as high blood pressure. (Doc. 83-5, p. 5). Mr. Welch takes medication daily to control his blood pressure, but his medical records reflect that, at times, his hypertension is only marginally controlled. (Doc. 83-5, pp. 5, 54). While on medication, Mr. Welch had higher than normal blood pressure readings in May and June of 2020. (Doc. 83-5, p. 31).[6] "The latest evidence shows that people with uncontrolled or untreated high blood pressure may be at risk of

---

[6] "A normal blood pressure level is less than 120/80 mmHg." https://www.cdc.gov/bloodpressure/about.htm.

getting severely ill with COVID-19."  William F. Marshall, III, *COVID-19 and High Blood Pressure: Am I at Risk?*, MAYO CLINIC, June 30, 2020, https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/coronavirus-high-blood-pressure/faq-20487663.  In fact, "[t]he most prevalent comorbidity in patients hospitalized for COVID-19 was hypertension, which was also a risk factor for acute kidney injury in the [emergency room] and mortality in these patients . . . ."  Darlene Dobkowski, *Studies Find Hypertension Most Prevalent Comorbidity in Patients Hospitalized for COVID-19*, CARDIOLOGYTODAY, Sept. 10, 2020, https://www.healio.com/news/cardiology/20200910/hypertension-may-affect-outcomes-in-covid19.  The American Medical Association explained that this "dangerous trend in hypertension" may leave patients "at increased risk for more severe outcomes if they acquire the SARS-CoV-2 infection."  Sara Berg, *Why BP Control Takes on Greater Importance During COVID-19*, AMERICAN MEDICAL ASSOCIATION, Nov. 17, 2020, https://www.ama-assn.org/delivering-care/hypertension/why-bp-control-takes-greater-importance-during-covid-19.

Courts have recognized hypertension as an underlying health condition that supports compassionate release.  *See, e.g.*, *United States v. Weems*, --- F. Supp. 3d ---, 2020 WL 4558381, at *5 (S.D. Fla. Aug. 7, 2020) (granting compassionate release where inmate had health conditions and "other elevating-

13

risk health problems like hypertension."); *United States v. Feucht*, 462 F. Supp.

3d 1339 (S.D. Fla. 2020) (granting compassionate release to defendant with

hypertension and other health conditions); *United States v. Bertrand*, --- F.

Supp. 3d ---, 2020 WL 2179387 (N.D. Fla. Apr. 20, 2020) (same).

Compounding these problems is Mr. Welch's diagnosis of type 2

diabetes.  Mr. Welch takes medication twice daily to treat his diabetes; however,

his records reflect that his A1C had "crept up to 7.3" in May of 2020, so his

dosage of metformin was increased. (Doc. 83-5, pp. 28-29).  The CDC reports

that a normal A1C is below 5.7%, and "the goal for most people with diabetes

is 7% or less."  ALL ABOUT YOUR A1C, CENTERS FOR DISEASE CONTROL AND

PREVENTION,         https://www.cdc.gov/diabetes/managing/managing-blood-

sugar/a1c.html#:~:text=Diagnosing%20Prediabetes%20or%20Diabetes&text=

A%20normal%20A1C%20level%20is,for%20developing%20type%202%20di

abetes (last visted on December 11, 2020).  "Early research show[s] that

diabetes patients . . . have [COVID-19] mortality rates that are more than twice

as high as overall mortality rates."  *United States v. Rodriguez*, 451 F. Supp. 3d

392, 394 (E.D. Pa. 2020).  The CDC cautions that "[h]aving type 2 diabetes

increases your risk of severe illness from COVID-19."  DIABETES, PEOPLE WITH

CERTAIN MEDICAL CONDITIONS, CORONAVIRUS DISEASE, CENTERS FOR DISEASE

CONTROL    AND    PREVENTION,    https://www.cdc.gov/coronavirus/2019-

ncov/need-extra-precautions/people-with-medical-conditions.html          (last updated Dec. 1, 2020).   "People with diabetes tend to live in a chronic inflammatory state, setting them up for a more severe inflammatory response to Covid-19 that can culminate in a life-threatening cytokine storm."  Elizabeth Cooney, *Why People with Diabetes are Being Hit so Hard by Covid-19*, STAT, Oct.   1,   2020,   https://www.statnews.com/2020/10/01/why-people-with-diabetes-are-being-hit-so-hard-by-covid-19/.  "People with type 2 diabetes also have more ACE2 receptors in many tissues, including those lining blood vessels . . . opening many more doors to Covid-19 invasion.  ACE2 is one receptor that the coronavirus's spike protein uses to gain entry into cells."  Elizabeth Cooney, *Why People with Diabetes are Being Hit so Hard by Covid-19*, STAT, Oct. 1, 2020,    https://www.statnews.com/2020/10/01/why-people-with-diabetes-are-being-hit-so-hard-by-covid-19/.

Mr. Welch's hepatitis C may increase his vulnerability to COVID. According to the Mayo Clinic, hepatitis C is a viral infection that can cause liver inflammation.  Deb Balzer, *What People Living With Hepatitis C Need to Know About          COVID-19*,          Apr.          21,          2020, https://newsnetwork.mayoclinic.org/discussion/what-people-living-with-hepatitis-c-need-to-know-about-covid-19/.   Dr. Rizza, an infectious disease specialist for the clinic, states, "[i]f somebody has hepatitis C with end-stage

liver disease, they could be more at risk of having a bad reaction to the virus that causes COVID-19.   If somebody had good liver function and is asymptomatic for hepatitis C, then at this point we don't know that there should be anything different from those who do not have hepatitis C infection." Deb Balzer, *What People Living With Hepatitis C Need to Know About COVID-19*, Apr. 21, 2020, https://newsnetwork.mayoclinic.org/discussion/what-people-living-with-hepatitis-c-need-to-know-about-covid-19/.

According to Mr. Welch's medical records, he is not being treated for the hepatitis virus.  (83-5, p. 41).  Mr. Welch reports that "BOP does not provide treatment for Hepatitis C as a matter of course for all infected inmates.  Rather, BOP guidelines give the highest priority for treatment to those who have higher levels of fibrosis, cirrhosis, other serious complication, or certain comorbid conditions."  (Doc. 83, p. 9).  Mr. Welch contends that because he is not being treated, his hepatitis C is uncontrolled. (Doc. 83, p. 9).  His medical records are inconclusive on this point.  The records show that labs were ordered because Mr. Welch requested treatment for his hepatitis C on May 29, 2020, and at his visit on July 1, 2020, his request still was pending.  (Doc. 83-5, pp. 5, 14).  In February and May of 2020, Mr. Welch's APRI, a formula used to assess liver fibrosis progression in patients with chronic hepatitis C, appeared normal at

0.24. (Doc. 83-5, pp. 25, 28, 54).[7]  A score of 0.5 or less usually suggests that a liver is either completely free of fibrosis or that it has a small amount of scarring. *What Is the APRI Score?*, WEBMD,  https://www.webmd.com/hepatitis/what-is-apri-score#:~:text=There%20are%20two%20numbers%20to,scarring%20and%20likely%20some%20cirrhosis (last visited December 11, 2020).   In sum, it is unclear whether Mr. Welch's hepatitis C increases the risk that he may face severe illness or death if he were to contract COVID-19.

At 64 years old with multiple risk factors, Mr. Welch is particularly vulnerable to severe outcomes from a COVID-19 infection.  "[P]atients with COVID-19 disease who have comorbidities, such as hypertension or diabetes mellitus, are more likely to develop a more severe course and progression of the disease." Adekunle Sanyaolu et al, *Comorbidity and its Impact on Patients with COVID-19*, SN COMPREHENSIVE CLINICAL MEDICINE, June 12, 2020, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7314621/pdf/42399_2020_Article_363.pdf.   Mr. Welch's risk of severe outcomes is exacerbated by his incarceration.   Given his age and medical risk factors, Mr. Welch has

---

[7] Mr. Welch's A1C and APRI levels from February 2020 may have been copied on his May 2020 reports without new tests; the language in the reports is identical.  (Doc. 83-5, pp. 25, 28, 54).

demonstrated that extraordinary and compelling reasons that warrant compassionate release.[8]

Therefore, the Court must consider the sentencing factors in 18 U.S.C. § 3553(a) to determine whether Mr. Welch is "a danger to the safety of any person or to the community, as provided in 18 U.S.C. § 3142(g)," U.S.S.G. § 1B1.13(2), and whether a reduction of his sentence is consistent with the Sentencing Commission's policy statements in 18 U.S.C. § 3582(c)(1)(A).

The Court recently evaluated the sentencing factors in 18 U.S.C. § 3553(a) as they pertain to Mr. Welch. (Doc. 90, pp. 13-15). The Court will not repeat that discussion here. Instead, the Court focuses on a § 3553(a) factor that the Court omitted from its previous opinion: "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). With respect to medical care, the record demonstrates that Mr.

---

[8] The FDA recently has approved emergency use authorization for Pfizer's COVID vaccine, and FDA approval is anticipated for the Moderna vaccine. https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19. Other COVID vaccinations are being tested. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html. For now, there is a limited supply of the approved vaccine, and priority is being given to health care workers and residents of nursing homes. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html. At best, if medical recommendations influence policy decisions, prisoners may be in the second tier of vaccine distribution. https://www.centerforhealthsecurity.org/our-work/pubs_archive/pubs-pdfs/2020/200819-vaccine-allocation.pdf. That means that, at best, COVID vaccinations are months away for prisoners.

Welch's health has deteriorated since he has been in prison. At the time of sentencing, he weighed 190 pounds. He had high blood pressure, but he was not receiving needed medication in jail to treat his hypertension. (Doc. 37, p. 19). His presentence report contains no information about diabetes or hepatis C. While imprisoned over the past 13 years, Mr. Welch has gained nearly 50 pounds, becoming obese, and he has developed diabetes, hepatitis C, sciatica, osteoarthritis, and glaucoma, among other medical conditions. His hypertension is treated, but he suffers from edema (swelling caused by fluid retention, generally in the hands and feet). Some of this deterioration may be a product of aging, but the deterioration likely is exacerbated by imprisonment. As noted, though he is designated for chronic care, in prison, Mr. Welch must wait significant periods of time for diagnostic testing for chronic conditions like hepatitis C.[9]

It comes as no surprise then that non-medical BOP facilities like Talladega FCI are not equipped to handle significant COVID outbreaks or to treat prisoners who develop severe symptoms of COVID. *See* Danielle Ivory, *"We Are Not a Hospital": A Prison Braces for the Coronavirus*, N.Y. TIMES

---

[9] *See* Andrew Brunsden, Comment, *Hepatitis C in Prisons: Evolving Toward Decency Through Adequate Medical Care and Public Health Reform*, 54 UCLA L. REV. 465, 507 (2006) ("[T]he rapid growth of prison populations, aging inmates, and rising health care costs . . . exert increasing pressure on prison health programs with limited resources to meet medical needs.").

(Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html (quoting federal prison medical worker stating that medical supplies and staff were short, even without an outbreak, and acknowledging that the prison simply would not be able to handle a COVID-19 surge as, "We don't have ventilators on hand at all. We are not a hospital. We don't have the medical staff.").[10]   Because Mr. Welch is vulnerable to severe outcomes if he should become infected with COVID and because Talladega FCI is not equipped to address severe complications of COVID, should he become infected, Mr. Welch would have to be taken to a healthcare facility in Talladega County.  Talladega County currently is at 100% ICU capacity and is at "high risk of hospital overload."                               https://covidactnow.org/us/alabama-al/county/talladega_county?s=1445408 (last visited Dec. 16, 2020).

A modified sentence will provide Mr. Welch with better opportunities for medical care, both for his chronic conditions and for COVID, should he become infected.  If released, Mr. Welch would reside with his daughter and her family

---

[10] *See also* Maureen Leddy, *A Tinderbox*, 56-SEP TRIAL 38, 41 (2020) ("[M]any prisons are located in small rural communities that lack necessary health care facility capacity to deal with a large [COVID-19] outbreak, but . . . even urban areas are being overwhelmed."); Jenny E. Carroll, *Pretrial Detention in the Time of COVID-19*, 115 NW. U. L. REV. ONLINE 59, 73 (2020) ("Even before the current health crisis, the conditions of the nation's jails and prisons rendered their occupants susceptible to contagions in ways that members of the free world were not.  Jails and prisons are infamous for overcrowding and lack of medical care.  In 2016, the DOJ issued two reports on the Bureau of Prisons (BOP) confirming these concerns in federal prisons, finding that BOP experienced chronic medical staff shortages and failed to take adequate measures to address them.").

in Bessemer, Alabama.  The City of Bessemer is home to UAB West, an arm of the University of Alabama at Birmingham Hospital—one of the largest academic medical centers in the United States and named one of the U.S. News and World Report's Best Hospitals.  *UAB Medicine*, https://www.uabmedicine.org/about (last visited December 11, 2020).  UAB's main hospital is in Birmingham, Alabama, a relatively short drive from Bessemer.  UAB's facilities are located in Jefferson County.  Jefferson County currently is at 50% ICU capacity and "can likely handle a new wave of COVID."  https://covidactnow.org/us/al/county/jefferson_county?s=1445408. (last visited Dec. 16, 2020).  Were Mr. Welch to contract COVID-19, he would be better served by the UAB Health System as opposed to the care he would receive while incarcerated.

Mr. Welch is not a danger to the community.  During his 13 years in prison, Mr. Welch has not been disciplined.  In fact, he has received positive reviews from supervising officers.  (Docs. 70-1, 71).[11]  When the Court releases him, he will be supervised by a probation officer for a total of 10 years, so he will have support and enforced restrictions on his conduct.  Mr. Welch will

---

[11] Mr. Welch's unit manager has predicted that Mr. Welch will "be a positive role model for others."  (Doc. 71).  The Court notes that after the Court granted Mr. Welch's motion for relief from his sentence on Count 1, Mr. Welch wrote a short thank you letter to the Court. It is attached to this memorandum opinion.  In it, Mr. Welch did not ask for additional relief; he simply thanked the Court for the relief he received.  The thank you note bolsters the observation from Mr. Welch's unit manager.

know that if he reoffends while on supervised release, he will be subject to revocation of his supervised release and imprisonment.  That is significant incentive not to break the law.  Moreover, recidivism rates decline with age.  According to the Sentencing Commission, offenders aged 65 and older are least likely to be rearrested, reincarcerated, or reconvicted.  *The Effects of Aging on Recidivism Among Federal Offenders,* UNITED STATES SENTENCING COMMISSION,                    (DECEMBER                    2017) https://www.ussc.gov/sites/default/files/pdf/research-and-

publications/research-publications/2017/20171207_Recidivism-Age.pdf.

### III.   CONCLUSION

For the reasons discussed in this opinion, the Court grants Mr. Welch's motion for compassionate release as of December 22, 2020 at noon.  Mr. Welch shall self-quarantine at his approved residence for 10 days, except for necessary medical treatment and only upon prior notice and approval by the probation officer, except in a true emergency.  Upon completion of the 10-day quarantine, Mr. Welch shall serve a special term of supervised release of 24 months before he begins the 96-month term of supervised release in his judgment.  Mr. Welch must have access to a cellphone with video capabilities to allow him to communicate with his probation officer.  The standard and

special conditions of supervised release in Mr. Welch's judgment shall apply

during Mr. Welch's special 24-month term of supervised release.

      **DONE** and **ORDERED** this December 18, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE